IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOROTHY BIELA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| WESTFIELD INSURANCE COMPANY | : | NO. 19-4383 |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                                                  January 19, 2021

Dorothy Biela ("Plaintiff" or "Ms. Biela") brought this action for breach of contract and bad faith based on Westfield Insurance Company's ("Defendant" or "Westfield") denial of insurance coverage for losses resulting from a heating oil spill at her home at 6 Township Line Road in Line Lexington, Pennsylvania. Presently before the court is Westfield's motion for summary judgment. Doc. 1-1. For the reasons that follow, I will grant Westfield's motion and enter judgment in Westfield's favor.

**I.     FACTS**

Ms. Biela purchased and moved into the home in 1985, and lived there until January 2019. Biela Dep. at 10-11, 13.[1] The house has oil heat and hot water with an oil burner/furnace in the basement. Id. at 17-18. Carney Heating and Plumbing ("Carney") maintained and serviced the furnace, which Ms. Biela purchased in 1989. Id. at 18-20.

---

[1]Ms. Biela's deposition is attached to Westfield's summary judgment motion. Doc. 31-4. Pinpoint citations to the deposition will be to the deposition pages. All other pinpoint citations to documents in the summary judgment record will be to the ECF document and page.

The home has a 275-gallon outdoor, above-ground oil tank located outside the kitchen, which was installed by Carney in 2004, and was routinely filled with home heating oil by Moyer Indoor Outdoor ("Moyer"). Id. at 33-35, 37-38; Doc. 31-10 at 3. Moyer last filled the tank with 190.4 gallons of heating oil on Thursday, January 24, 2019. Doc. 31-7 (receipt); Biela Dep. at 48.

At some time in late January 2019, Ms. Biela smelled oil in the house and suspected there was a problem with the heater in the basement. Biela Dep. at 45-46. "[T]he smell persisted for the next couple of days," although she was still getting heat. Id. at 46. She called Carney to schedule an appointment. Id. On Saturday in the last week in January, before Carney had come out to evaluate the problem, Ms. Biela discovered that her oil tank had lost half its contents. Id. at 46-47.[2] On January 29, someone from J&J Spill Service & Supplies, Inc. ("J&J"), pumped out the sump pump pits, cleaned up oily debris, and put a boom around the pump discharge lines. Id. at 49; Doc. 31-8 (receipt). J&J did not dig up any soil. Biela Dep. at 49-50. At that point, Ms. Biela stopped living at the property because she had no heat or running water and "a strong odor permeated everything." Biela Dep. at 50. Ms. Biela did not contact the Environmental Protection Agency or any other governmental entity and has done nothing further to remediate the damage caused by the fuel oil leak. Id. She also testified that the

---

[2]The court notes that the last Saturday of January 2019 was January 26. Ms. Biela explained that during the week, she had not been home during the daylight hours. She left for work before dawn, visited her mother in the hospital after work, and would not return home until after dark. Id. at 45. When she saw the fuel gauge on the tank in the daylight on that Saturday, she realized that it "had dropped quite a bit." Id. at 46.

tank is empty due to the leak.  Id. at 65.  Ms. Biela spent approximately $3,000 for the initial containment and approximately $6,000 to winterize the home, but otherwise has not had any repairs done as she cannot afford them.  Id. at 58, 63, 67.  Plaintiff retained environmental contractor Trimpi Associates, Inc. ("Trimpi"), which examined the site and opined in July 2020 that approximately 250 gallons of fuel oil were released and migrated through and underneath the stone foundation wall impacting the basement and also the sump pumps, which discharged oily water into a swale along the adjoining road.  Doc. 31-12 at 6.  Trimpi estimated the cost for investigating and remediating the basement, soil, and groundwater at $265,000 to $273,000.  Doc. 31-13 at 2-3.

Plaintiff filed her claim with Westfield on January 28, 2019, and Westfield sent its representative, Rob Henry, to investigate the claim the following day.  Biela Dep. at 50-51; Doc. 31-9 ¶¶ 3, 4, 7.[3]  John Schlitter, P.E., an engineer hired by Westfield, inspected Ms. Biela's property on February 5, 2019.  Doc. 31-10 at 3.  Mr. Schlitter issued a report on February 15, 2019, which noted "[p]atches of surface corrosion . . . throughout the surface of the tank."  Id. at 4.  Mr. Schlitter concluded that "the leak in the heating oil tank was the result of long-term corrosion of the tank."  Id.  Also on February 15, 2019, Westfield denied the claim based on Mr. Schlitter's report, citing the policy's exclusions for loss caused by rust/corrosion and pollutants, and stating the its investigation determined that "the pollutant release was the result of long-term deterioration, rust and

---

[3]Plaintiff did not depose any witnesses associated with Westfield.  As part of its summary judgment motion, Westfield attached the Declaration of Derek Groff, Property Unit Leader for Westfield and the supervisor assigned to Ms. Biela's claim.  Doc. 31-9.

decay . . . and not the result of one of the Covered Perils." Doc. 31-9 ¶ 11; Doc. 31-11 at 3-4 (denial letter).

Ms. Biela filed this suit for breach of contract and bad faith in the Philadelphia County Court of Common Pleas on April 16, 2019.[4]  Doc. 1-1.  Westfield removed the case to federal court on September 23, 2019.  Doc. 1.  Westfield filed its motion for summary judgment on October 28, 2020, arguing that it properly denied coverage based on policy exclusions for pollutants and long-term corrosion, that there is no evidence to support the claim for bad faith, and that Plaintiff breached the policy by failing to mitigate the loss.  Doc. 31-1.  Plaintiff filed a response and Defendant filed a reply.  Docs. 32 & 33.

## II.  **LEGAL STANDARD**

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[5]  A factual dispute is "material" if it might affect

---

[4]Ms. Biela also named Carney and Moyer as defendants, accusing both of negligence and Carney with breach of contract.  Doc. 1-1.  The Court of Common Pleas of Philadelphia County severed the claims against Carney and Moyer and transferred that action to the Court of Common Pleas of Bucks County.  Doc. 1-2 (severance order).  Westfield then removed the matter based on diversity of citizenship.  Doc. 1 at 1-3; Doc. 31-1 at 6.

[5]Anderson predated the 2010 Amendment to Rule 56.  However, the change in wording and location within the rule for the summary judgment standard did not alter the

the outcome of the case under governing law. Id. The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the adverse party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "The non-moving party cannot rest on mere pleadings or allegations" and must point to actual evidence in the record on which a fact finder would rely in deciding its way. El v. Se. Pa. Transp. Auth., 479 F.3d 232, 242 (3d Cir. 2007). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000). Finally, the evidence presented must be viewed in the light most favorable to the non-moving party with all inferences drawn in that party's favor, Prowel v. Wise Bus. Forms, 579 F.3d 285, 286 (3d Cir. 2009); Anderson, 477 U.S. at 255, and the court may not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000).

---

standard or caselaw interpretation of the standard. Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendments.

### III. DISCUSSION[6]

#### A. Breach of Contract

In cases involving insurance coverage disputes in Pennsylvania, "the insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage, but if the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage." Hamm v. Allstate Prop. & Cas. Ins. Co., 908 F. Supp.2d 656, 666 (W.D. Pa. 2012) (quoting State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009)). Judicial review of an insurance contract "is aimed at ascertaining the intent of the parties as manifested by the language of the written instrument." Bateman v. Motorists Mut. Ins. Co., 590 A.2d 281, 283 (Pa. 1991). If the provision at issue is ambiguous, it "is construed in favor of the insured," whereas if "the policy language is clear and unambiguous, we give effect to the language of the contract." Id.

##### 1. The Policy

The policy provides "Coverage A – Dwelling," "Coverage B – Other Structures," and "Coverage C – Personal Property." Doc. 31-6 at 19-20. With respect to Coverages A & B, the policy insures against "direct physical loss," but does not insure for certain identified losses. Id. at 26. Of potential relevance here are two identified losses that are not covered, namely loss caused by (1) "rust or other corrosion," and (2) "[d]ischarge . . .

---

[6]The parties agree that Pennsylvania law applies to Ms. Biela's claims. Doc. 31-1 at 7; Doc. 32-2 at 11.

of pollutants unless the discharge . . . is itself caused by a Peril Insured Against under Coverage C." Id. at 27.  With respect to Coverage C, the policy insures for "direct physical loss . . . caused by a [listed] peril . . . unless the loss is excluded." Id. at 28.  One of the listed perils is the "sudden . . . cracking . . . of a . . . hot water heating system." Id. at 29.

I will first determine whether, as Ms. Biela contends, the loss falls under the listed peril for sudden failure of a heating system, and this discussion also implicates the corrosion exclusion.  I will then turn to the pollutant exclusion.

### 2. Sudden Failure of the Heating System

The parties dispute the applicability of the provision for a sudden cracking of a hot water heating system. As noted, this is identified as one of the covered perils for purposes of the personal property coverage (Coverage C).  Also, to the extent Westfield relies on the exclusion for pollutants, that exclusion does not apply if the discharge of the pollutant was itself caused by this identified peril.

The relevant provision is as follows:

> **13. Sudden and Accidental Tearing Apart, Cracking, Burning or Bulging**
>
> This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

Doc. 31-6 at 29.  Plaintiff argues that the evidence demonstrates a sudden loss, Doc. 32-2 at 23, whereas Defendant argues that the failure of the tank was not sudden and accidental, but rather was the result of long-term corrosion.  Doc. 31-1 at 9, Doc. 33 at 6.

7

Plaintiff offers no expert or other opinion as to what caused the tank to leak. Plaintiff theorizes that because the tank was filled by Moyer on January 24, and Plaintiff "first smelled the oil [on] January 25, 2019," "the tank undeniably cracked or tore apart," allowing a jury to could conclude that the loss was sudden. Doc. 32-2 at 26. However, the record does not support this contention.

There is no direct evidence of when the leak started, nor did any witness observe the leak. The record shows that the tank was filled on January 24 (a Thursday). Doc. 31-7. Ms. Biela first became aware that the tank lost oil on the last Saturday in January (the 26th), when she noticed the gauge on the tank "had dropped quite a bit." Biela Dep. at 46-48. She testified that after she first smelled oil, the smell "persisted for the next couple days," and then "toward the end of the week . . . either a Thursday or a Friday," she called Carney to schedule an appointment, but she discovered the leak before Carney came on Monday the 29th. Id. at 45-47. Her testimony was clear that the smell persisted for a period of days before she called Carney and then another one to two days passed before she noticed the loss of fuel from the tank. She explained that she did not feel the need to call when she first smelled the oil because she still had heat, indicating that there was still fuel oil in the tank fueling the oil burner/heater. Id. at 46. Thus, Plaintiff's own deposition testimony does not support her theory of a sudden failure of the tank or establish that the leak began sometime after the oil delivery on the 26th.

Plaintiff also relies on Westfield's claim notes to support her theory of a sudden and accidental loss. Doc. 32-2 at 26 (citing Doc. 32-3 at 2-3). The notes indicate that the tank ruptured, that the loss occurred on January 25, 2019, and was reported to Westfield

8

on January 28, 2019.  Doc. 32-3 at 2-3.  However, this note merely reflects Plaintiff's own report of the loss on January 28, 2019, not any finding of a rupture.  Mr. Henry, Westfield's representative, first inspected the loss the following day.  Similarly, the date of the loss refers to Plaintiff's self-reported date of loss.  As previously noted, Plaintiff's deposition testimony is inconsistent with this date.

Defendant relies on the engineering report from Mr. Schlitter, who opined that the leak "was the result of long-term corrosion of the tank."  Doc. 31-1 at 9 (citing Doc. 31-10 at 4).  His conclusion was based on his examination as follows:

> . . . . Patches of surface corrosion were distributed throughout the surface of the tank; however, corrosion with loss of mass of the tank wall was observed at the bottom right area of the tank and this area was wet with oil indicating an opening in the tank wall resulting in the release of the tank contents.  No indentations or gouges were observed on the surface of the tank to otherwise suggest that the tank had been impacted by flying debris, vehicle impact, etc.
>
> As the tank is vented to the atmosphere, condensation can accumulate within the heating oil tank over-time and collect at the bottom of the tank.  This water, combined with oxygen from the atmosphere will result in the corrosion of steel tanks from the inside out and will eventually risk the perforation of the tank wall.  The accumulation of water within the tank can be limited by pitching the tank downward toward the exit port.  The inspection found that the tank was pitched downward to the right side of the tank, away from the exit port which was located on the top right side of the tank.  As such, water would be expected to accumulate at the bottom right extent of the tank where the most severe corrosion was observed at the exterior face of the tank.

Doc. 31-10 at 4.  This report is the only evidence in the record as to what caused the tank to leak, and Plaintiff offers no evidence to undermine the engineer's conclusion.  In short,

the record does not support an inference that the tank suffered a sudden and accidental failure. Therefore, the loss does not qualify as a covered peril in Coverage C for sudden failure of the heating system.

The fact that the leak was caused by corrosion of the tank also brings into play another provision of the policy. Under Coverages A and B, the policy does not insure for loss caused by "rust or other corrosion." Doc. 31-6 at 26-27.[7] As the summary judgment record permits only one conclusion as to the cause of the leak, this exclusion applies to any claim under Coverages A and B.

Seizing upon language in Mr. Schlitter's report, Plaintiff contends that she should be entitled to coverage because the corrosion was caused by the improper installation of the tank. Doc. 32-2 at 8. Defendant responds that Plaintiff's argument ignores the engineer's ultimate conclusion that the failure of the tank was due to long-term corrosion. Doc. 33 at 4.

As previously noted, the record evidence establishes that the tank failed due to long-term corrosion, which is specifically excluded by the policy. Moreover, Plaintiff does not point to a provision in the policy that covers a loss resulting from corrosion where that corrosion was itself the result of the owner's or a third-party's error in installation. Other provisions in the policy preclude coverage for neglect in maintenance and repair. See, e.g., Doc. 31-6 at 30 (exclusion for insured's neglect), 31 (exclusion for

---

[7]The policy similarly does not cover losses caused by "[w]ear and tear, marring [or] deterioration." Doc. 31-6 at 27.

10

faulty, inadequate or defective design, workmanship, repair, construction etc.). Plaintiff has not established that she is entitled to coverage under this theory.

There are no issues of material fact regarding the cause of the failure of the tank. Westfield's engineer identified long-term corrosion as the cause and Plaintiff has offered nothing to undermine this conclusion. Plaintiff's unsubstantiated allegations are insufficient to raise an issue of material fact.

### 3. Pollutant Exclusion

Westfield also relies on the pollutant exclusion in the policy to exclude coverage for the cost of cleaning up the leaked fuel oil. Doc. 31-1 at 9-10. As noted, the policy covers "direct physical loss" to the dwelling and structures (Coverages A and B), but does not cover certain specified losses. Doc. 31-6 at 26.

> We do not insure, however, for loss . . . [c]aused by . . . [a]ny of the following . . . [d]ischarge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril insured against under Coverage C.
>
> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

Id. at 26-27.

Plaintiff argues that home heating oil is not considered a pollutant under Pennsylvania law. Doc. 32-2 at 13-14.[8] Specifically, Plaintiff relies on two cases in

---

[8]Although Plaintiff disputes the characterization of the spilled substance as "Ultra Low Sulfur Heating Oil," Doc. 32-2 at 17, Ms. Biela testified at her deposition that the tank contained home heating oil, Biela Dep. at 33, 70, 75, and the Moyer receipt indicates a delivery of 190.4 gallons of heating oil. Doc. 31-7. Moreover, as will be discussed

11

which judges of this court found that similar exclusions did not apply to heating oil spills. Doc. 32-2 at 13-14 (citing Whitmore v. Liberty Mut. Fire Ins. Co., Civ. No. 07-5162, 2008 WL 4425227 (E.D. Pa. Sept. 30, 2008); Atlantic Cas. Ins. Co. v. Epstein, Civ. No. 03-6506, 2004 WL 2075038 (E.D. Pa. Sept. 15, 2004)). Defendant argues that the cases upon which Plaintiff relies do not stand for the proposition that home heating oil is not a pollutant and are distinguishable from the facts presented here. Doc. 33 at 2.

In both Whitmore and Epstein, the courts were called upon to determine whether heating oil was a pollutant as defined in each of the policies for purposes of a pollutant exclusion. See Whitmore, 2008 WL 4425227 at *3-4; Epstein, 2004 WL 2075038 at *3. By way of background, these cases built upon two decisions of the Pennsylvania Supreme Court. In Madison Construction Company v. Harleysville Mutual Insurance Company, the Pennsylvania Supreme Court held that the court must focus on "the specific product at issue" to determine if it is a pollutant, and concluded that the floor sealant at issue fell under the pollutant exclusion. 735 A.2d 100, 107 (Pa. 1999).[9] In Lititz v. Mutual Insurance Company v. Steely, the Pennsylvania Supreme Court applied Madison in determining that lead-based paint was a contaminant based upon affidavits from chemical experts identifying lead-based paints as a cause of lead poisoning and

---

later in this section, the soil and water samples tested by Trimpi Environmental Associates identified the leak as #2 Fuel Oil, with its component chemicals. Doc. 31-12.

[9]Included in the evidence in Madison was a Material Safety Data report identifying the chemical components of the product, several of which were considered hazardous pollutants by the federal government. 735 A.2d at 107. Based on this evidence, the court found that the sealant fell into the policy's exclusion. Id.

various federal laws recognizing lead as a hazard or pollutant. 785 A.2d 975, 980 (Pa. 2001).

In Whitmore, the court noted that "[u]nlike the fact patterns and insurers in Madison and Lititz, [the insurer] has not provided any product report, expert opinion, or other source of information to show or even argue that home heating oil is a 'pollutant' within the policy's pollution exclusion." 2008 WL 4425227, at *4. Similarly, in Epstein, the court noted that the insurer provided no analysis of the heating oil involved or "any reports regarding its toxicity or chemical makeup." 2004 WL 2075038, at *5.

Here, the evidence that was lacking in Whimore and Epstein is present in the summary judgment record. Specifically, the record includes a report from Trimpi, the environmental consultant, of the soil samples taken at Plaintiff's property. Doc. 31-12 at 5 (listing substances found in soil including benzene, ethylbenzene, isopropylbenzene, 1,2,4- and 1,3,5-thrimethylbenzene, toluene, and naphthalene). The chemicals included several identified as pollutants by federal law and regulation. See United States v. Union Gas Co., 586 F. Supp. 1522, 1523 (E.D. Pa. 1984) (naphthalene and ethylbenzene are toxic pollutants); 40 C.F.R. § 116.4 (naphthalene and toluene are toxic pollutants).[10]

---

[10]Westfield also included a Safety Data Sheet with respect to No. 2 Fuel Oil, purporting to establish that it is a skin, eye, and respiratory irritant; the inhalation of which may cause nausea, vomiting, coma, and unconsciousness; and the ingestion of which may cause vertigo, headache, coma, or death. Doc. 31-5. Mr. Goff states in his declaration that Moyer provided the data sheet "for the No. 2 fuel oil." Doc. 31-9 ¶ 13. Plaintiff contends that the document was not included in Westfield's document production and is not properly before the court. Doc. 32-2 at 16-18. Even without considering the Safety Data Sheet, Defendant has produced sufficient evidence for the court's determination.

Trimpi recommended extensive investigation and remediation consistent with pollutant contamination. Doc. 13-2 at 2-3 (work estimate includes, inter alia, floor and soil removal or restoration, subslab decontamination or replacement, soil sampling, and five years of quarterly groundwater sampling).

This case is very similar to Barg v. Encompass Home and Auto Insurance Company, where the court determined that heating oil leaking from the plaintiffs' furnace constituted a pollutant for purposes of a policy exclusion. Civ. No. 16-6049, 2018 WL 487830 (E.D. Pa. Jan. 19, 2018). In making that determination, my colleague, the Honorable Marilyn Heffley, conducted the analysis advocated by the Pennsylvania Supreme Court in Madison. The court noted that the plaintiffs had engaged the services of an environmental services firm rather than an ordinary construction contractor for remediation, recognized that soil testing revealed contamination by pollutants, including ethyl benzene, isopropyl benzene, naphthalene, toluene, and 1,2,4 trimethylbenzene, and relied on prior findings of this court regarding pollutants and various federal regulations identifying the substances as toxic pollutants or hazardous substances. Id. at *5. In the court's judgment, this record distinguished the case from Whitmore. Id. at *4.

Here, Plaintiff contacted an environmental services firm about remediation and provided the court with the soil analysis identifying the same chemicals as were present in the soil in Barg, and provided ample evidence that those chemicals were considered hazardous or pollutants. Like Barg, "the record here presents more than sufficient evidence to allow the Court to apply the pollution exclusion to the facts of this case." 2018 WL 487830, at *4.

Plaintiff likens Barg to pre-Madison cases that did not apply an analysis of the products at issue and instead relied only on dictionary definitions of policy terms. Doc. 32-2 at 20-21 (citing Graham v. Harleysville Ins. Co., 632 A.2d 939 (Pa. Super. 1993) (applied the exclusion for loss caused by discharge of "contaminants or pollutants" based on the terms' dictionary definitions)). Contrary to Plaintiff's argument, the Barg court followed the procedure endorsed by the Pennsylvania Supreme Court in Madison and followed in Lititz and did not stop at simply defining the terms of the policy. In Barg, the court looked to the facts of the case regarding remediation, and relevant state and federal laws and regulations to determine if the heating oil was a pollutant. Guided by Madison and Lititz, I have done the same.[11]

### B. Bad Faith

Defendant also seeks summary judgment on Plaintiff's bad faith claim. Doc. 31-1 at 16-19. Plaintiff responds that a litany of Defendant's actions in investigating and denying the claim establish Defendant's bad faith. Doc. 32-2 at 31-32.[12] To recover on

---

[11] Defendant also contends that Plaintiff beached the insurance contract by failing to mitigate her loss, Doc. 31-1 at 14-15, whereas Plaintiff argues that her efforts including contacting Carney to inspect the smell of oil, asking Carney how to proceed after she discovered the leak, and her contacting J&J establish her mitigation efforts. Doc. 32-2 at 29-30. Having determined that Defendant is entitled to judgment as a matter of law on the coverage/exclusion questions, I need not address this additional defense.

[12] According to Plaintiff, Westfield's bad faith is established by Westfield's failure to speak with Moyer or Carney, failure to obtain documents and photographs from J&J, failure to consider an exception to the pollution exclusion or cite the coverage section dealing with hot water heating systems, ignoring its own expert's report or failing to seek addition guidance regarding the failure of the tank, failing to offer Plaintiff any Additional Living Expense, failing to have a reasonable basis to determine that oil

15

the bad faith claim, Plaintiff must prove by clear and convincing evidence "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis." Gold v. State Farm Fire & Cas. Co., 880 F. Supp.2d 587, 597 (E.D. Pa. 2012) (quoting Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997) (citing Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994))). The Third Circuit has held that a defendant is entitled to summary judgment on a bad faith claim if it had a reasonable basis for its decision. Horowitz v. Federal Kemper Life Assur. Co., 57 F.3d 300, 307 (3d Cir. 1995).

> In order to determine whether an insurer acted in bad faith in conducting an investigation into whether an insured was entitled to benefits, courts have looked to the following:
>> Judges of this court have held that an insurance company's substantial and thorough investigation of an insurance claim, forming the basis of a company's refusal to make or continue making benefit payments, establishes a reasonable basis that defeats a bad faith claim . . . . To defeat a bad faith claim, the insurance company need not show that the process used to reach its conclusion was flawless or that its investigatory methods eliminated possibilities at odds with its conclusion. Rather, an insurance company simply must show that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action.

---

constitutes a pollutant or obtain an opinion from counsel on the subject, and providing a self-serving affidavit to "backfill its coverage decision." Doc. 32-2 at 31-32.

Levin v. Transamerica Occidental Life Ins. Co., Civ. No. 05-5172, 2008 WL 3895897, at *6 (E.D. Pa. Aug. 21, 2008) (quoting Mann v. UNUM Life Ins. Co., 2001 WL 22917545, at *7 (E.D. Pa. 2003)).

Here, as previously discussed, Defendant had a reasonable basis for its decision to deny Plaintiff's claim based on the engineering report finding that the leak was caused by long-term corrosion, excluded by the policy, and that the heating oil was a pollutant based on environmental testing, government regulations and prior caselaw. Plaintiff has presented no evidence presenting a genuine issue of material fact in this regard. Because I have found that Westfield had reasonable bases for its denial of Plaintiff's claim, Defendant is entitled to summary judgment on the bad faith claim.

## IV. CONCLUSION

Defendant is entitled to summary judgment on the breach of contract and bad faith claims. Plaintiff has failed to provide any evidence undermining the expert opinion that the leak in the heating oil tank was caused by long term corrosion, which is specifically excluded by the policy. In addition, contrary to Plaintiff's arguments, Defendant has established that the home heating oil involved in this case is a pollutant for purposes of the relevant policy exclusion. Finally, because Defendant has reasonable bases for its decision denying Plaintiff's insurance claim, Defendant is entitled to judgment in its favor on the bad faith claim.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOROTHY BIELA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| WESTFIELD INSURANCE COMPANY | : | NO. 19-4383 |

## **O R D E R**

AND NOW, this   19th   day of January, 2021, upon consideration of Defendant's Motion for Summary Judgment (Doc. 31), the response (Doc. 32), reply (Doc. 33), and all attached exhibits, and for the reasons stated in the accompanying Memorandum, IT IS HEREBY ORDERED that the Motion is GRANTED.  Judgment is entered in favor of Defendant and against Plaintiff.  The Clerk shall close this case statistically.

BY THE COURT:

/s/ Elizabeth T. Hey
_____
ELIZABETH T. HEY, U.S.M.J.